UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


JULIUS COLLINS, II,              )
                                 )
            Petitioner,          )
                                 )
        v.                       )        No. 4:05 CV 497 DDN
                                 )
CHUCK DWYER,                     )
                                 )
            Respondent.          )

### MEMORANDUM

This action is before the court upon the petition of Missouri state prisoner Julius Collins, II, for a writ of habeas corpus under 28 U.S.C. § 2254. The parties have consented to the exercise of plenary authority under 28 U.S.C. § 636(c).

On April 20, 2000, a jury[1] in the Circuit Court of St. Louis County found petitioner Collins guilty of five counts of first degree robbery of fast food restaurants, one count of attempted first degree robbery of a restaurant, and 6 counts of armed criminal action. (Doc. 15, Ex. 9 at 122-33.) On June 16, 2000, petitioner was sentenced to substantial terms of imprisonment. (Id. at 138-44.) His convictions and sentences were affirmed on direct appeal. (Id. at Ex. 12.)

On April 18 and August 2, 2002, petitioner filed motions for post-conviction relief under Missouri Supreme Court Rule 29.15. (Doc. 15, Ex. 14 at 3-27, 32-60.) On March 3, 2003, the circuit court denied relief following a hearing. (Id. at 97-109.) The denial of post-conviction relief was affirmed on direct appeal. (Id. at Ex. 17.)


### Charges and Trial Evidence

Petitioner was charged by amended information with the following:

Count 1:   First degree robbery of the Burger King restaurant at 1627
           Dunn Road, St. Louis County, Missouri, at 9:40 p.m., on

---

[1]Two earlier trials ended in mistrials for lack of unanimous verdicts.

January 10, 1997, while acting with another and displaying what appeared to be a deadly weapon;

Count 2: Armed criminal action relating to the Count 1 offense.

Count 3: First degree robbery of Rebecca Fincher at 13849 Manchester Road, St. Louis County, Missouri, at 3:50 a.m., on January 17, 1997, while displaying what appeared to be a deadly weapon.

Count 4: Armed criminal action relating to the Count 3 offense.

Count 5: First degree robbery of Rebecca Fincher at 13849 Manchester Road, St. Louis County, Missouri, at 4:20 a.m., on April 17, 1997, while displaying what appeared to be a deadly weapon.

Count 6: Armed criminal action relating to the Count 5 offense.

Count 7: First degree robbery of Timothy Dodge at 3121 North Highway 67, St. Louis County, Missouri, at 10:20 p.m., on July 6, 1997, while displaying what appeared to be a deadly weapon.

Count 8: Armed criminal action relating to the Count 7 offense.

Count 9: First degree robbery of Randy Gray at 12490 St. Charles Rock Road, St. Louis County, Missouri, at 3:50 a.m., on August 1, 1997, while acting with another and displaying what appeared to be a deadly weapon..

Count 10: Armed criminal action relating to the Count 9 offense.

Count 11: Attempted first degree robbery of a Steak 'N Shake restaurant at 1523 South Lindbergh, St. Louis County, Missouri, at 3:15 a.m., on August 22, 1997.

Count 12: Armed criminal action relating to the Count 11 offense.

(Doc. 15 Ex. 9 at 77-81.)

At trial the state offered the testimony of 22 witnesses.

January 10, 1997, robbery

Regarding Counts 1 and 2, Kiesha Givens testified about the robbery of the Burger King restaurant on Dunn Road where she worked on January 10, 1997. Among her co-workers was Julius Collins. On that night a robber entered the restaurant, stated to them, "You all know what to do," and told all the workers except Collins to go into a back break room. Instead, without asking who the manager was, he told Collins to hurry up and give him the money from the safe, Collins being the only person who could open it. Collins did so, the robber left, and Collins called the police. After the robber left the restaurant, Collins

returned to the break room and walked out of the break room with the rest of the employees. (<u>Id.</u> at 214-25.)

St. Louis County Police Detective Charles Stark testified that on January 10, 1997, he was dispatched to the Burger King restaurant at 1627 Dunn Road in St. Louis County. When he arrived he spoke with the restaurant manager, Julius Collins. Collins described the robbery that had just occurred, as well as the robber and the weapon used. (<u>Id.</u> at 295-301.)

<u>January 17, 1997, robbery</u>

Regarding Counts 3 and 4, employee Ricky Mills testified about the January 17, 1997, robbery of the Steak 'N Shake restaurant. He described the robber's actions, including placing the barrel of a snub-nosed .38 caliber pistol to Mr. Mills' head. Mills described the robber as a black male, about 5'11" tall and wearing a black ski mask, a down jacket, and black and white tennis shoes. Mills stated that he knew a man named Leo Stith who was about 6'3" and worked at the same fast food restaurant. Mills also testified that he had ridden in Stith's blue automobile. (<u>Id.</u> at 188-204.)

Rebecca Ann Reed, whose maiden name was Fincher, testified she was the assistant manager of the Steak 'N Shake restaurant at 13849 Manchester Road on January 17, 1997. She recounted the armed robbery that occurred there that day as follows. The robber entered the all-night restaurant at about 3:48 a.m. She was called out of the office by Ricky Mills and saw the robber holding a small handgun to Ricky's head. The robbery occurred and the robber left a few minutes after he arrived. She, too, knew Leo Stith, because he had worked at that restaurant until shortly before this robbery. The robber stood approximately 5' 10" tall, and Leo Stith was about 6' 2" or 3" tall. The robber had entered through an unlocked back door, which is usually kept locked. (<u>Id.</u> Ex. 3 at 225-46.)

St. Louis County Police Detective David Kneib testified that he investigated the January 17, 1997 robbery. On the scene he took custody

of the restaurant's security camera video tape of the robbery.  He also interviewed the witnesses and then turned the investigation over to Det. Neske.

## April 17, 1997, robbery

Regarding Counts 5 and 6, Reed also testified about the robbery of the same Steak 'N Shake restaurant on April 17, 1997.  She saw the robber enter the restaurant through the front door, wearing a ski mask, a big "bubble" coat, and carrying a rifle.  When Reed called out to a co-worker, the robber told her not to move and she stood still.  The robber pressed the rifle against her back and had her open the safe and put the money in a bag.  The robber ripped the telephone wires out of the wall during this robbery and during the previous robbery in January.  A video surveillance camera record shows the telephone wires being ripped at approximately 4:36 a.m.  On this occasion the back door of the restaurant was locked.  (Id. at 247-59.)

Alan Ross, another Stake 'N Shake restaurant employee, also testified about the April 17, 1997, robbery.  Ross described the robber, how he was dressed, and the gun he was carrying.  He recounted the events from the time the robber entered the restaurant.   Ross stated that he knew Julius Collins, Lorenzo Perry, and Perry's cousin because they all grew up together.   He also knew Leo Stith because he had worked with Stith at Steak 'N Shake.  (Id. at 205-13.)

## July 6, 1997, robbery

Regarding Counts 7 and 8, Timothy Dodge, the manager of the Burger King fast food restaurant at 3121 North Highway 67, testified that between 10:00 and 11:00 p.m. on July 6, 1997, as he and the restaurant crew were approaching closing time, a ski-masked male with a firearm directed Dodge and another employee to hand over the restaurant's money. He described the robber as a little shorter than his own 5' 8".  He speculated the robber was about 25 years of age and sounded as though he was black.  The employees did as the robber directed; the robber then

left with $2,500.   Mr. Dodge turned over to police the restaurant's security camera videotape.   The videotape was described as showing the robber enter the restaurant through the front door and engage in the robbery.   After the robbery, Mr. Dodge was not asked to view a line-up or further identify the robber.   (Id. Ex. 2 at 166-88.)

## August 1, 1997, robbery

Regarding Counts 9 and 10, Randy Gray testified about the robbery of the Steak 'N Shake restaurant at 12490 St. Charles Rock Road which he managed.   He testified that on August 1, 1997, at approximately 3:15 a.m., a black male wearing a mask came into the restaurant with a hand gun.   Gray handed the cash register money to the robber.   The robber ordered the restaurant staff and two customers into the cooler; he then directed Gray to open the safe.   Gray did so and put the money in a bag and handed it to the robber.   Gray then walked with the robber to the front of the store to retrieve the money from the front register.   Gray put that money in the same bag.   The robber then put Gray into the cooler with the others.   He told Gray that, if he stuck his head outside the cooler, he would shoot him.   Gray estimated the robber's height to be 6' 2".   (Id. at 260-70.)

Christopher Moody also testified about the robbery of the Steak 'N Shake restaurant at 12490 St. Charles Rock Road on August 1, 1997.   Moody and his co-worker at a UPS facility were customers in the restaurant. He described how a black male robber entered the restaurant wearing a black ski mask.   The robber directed everyone to go back to the kitchen. There the robber put the two customers and the waitress in the cooler. The robber kept the manager out of the cooler for about five minutes; then he placed the manager in the cooler also.   (Id. at 271-78.)

## August 22, 1997, attempted robbery

Regarding Counts 11 and 12, waitress Sharon Walker testified about the attempted robbery of the Steak 'N Shake restaurant at 1523 South Lindbergh on August 22, 1997, at approximately 3:15 a.m.   After

displaying a gun and demanding money, the robber left without the cash when the manager said she did not have the combination to the safe. (*Id.* at 329-34.) Waitress Laurie Roberts also described the August 22, 1997, incident. (*Id.* 334-41.)

Officer Jeffrey Parnas testified that on August 31, 1997, at 5:30 p.m., he stopped an automobile that fit the description of one used in a robbery earlier that day. The occupants were Leo Stith and Lorenzo Perry. Stith, who was driving the car, consented to the officer searching the car's trunk. Inside the trunk the officer found a .22 caliber rifle, a black ski mask, and some currency. (*Id.* at 303-11.)

Later, in the investigation of the August 1, 1997 robbery, Det. Neske developed a modus operandi of the robberies that involved a Taco Bell restaurant in the City of St. Louis. Det. Neske told Det. Kneib that he had developed a basis for interviewing[2] a person who worked at the Taco Bell. So, on September 2, 1997, between 8:00 and 8:15 a.m., Det. Kneib went to the restaurant and arrested petitioner Julius Collins, as he was working on the crew, on the "wanted" issued by Det. Neske. Det. Kneib brought Collins to the St. Louis County Police Station in Clayton and placed him in an interview room where Collins was given an opportunity to use the bathroom and to have a non-alcoholic drink. Det. Neske arrived at the station and advised Collins of his <u>Miranda</u> rights orally and in writing. (*Id.* at 278-94.)

St. Louis County Police Det. Paul Neske testified about his investigation. Julius Collins was arrested at his direction on September 2, 1997. After the arrest, Det. Neske advised Collins of his rights and questioned him about the robberies. Neske confronted Collins with information he obtained from Lorenzo Perry and Leo Stith that Collins was involved in the robberies. After denying his involvement at

---

[2]Det. Kneib testified that under the law of Missouri police officers with probable cause to believe that someone is involved in the commission of a crime can take the person into custody for 20 hours for the purpose of interrogation without a judicial warrant. <u>See</u> Mo. Rev. Stat. § 544.170.

first, Collins dropped his head and admitted he was involved in this robbery. (Id. at 353-90, 403-31.)

Municipal police officers testified at trial about their interviews with Collins. Florissant, Missouri, Det. Sgt. Timothy Lowery testified about his interview of Collins about the Burger King robbery; Collins admitted to the robbery and described it. (Id. at 460-75.) Sunset Hills Police Det. Lt. Jerry Taylor described his interview of Collins; during the interview Collins confessed to attempting to rob the Steak 'N Shake restaurant on August 22, 1997. (Id. 491-511.)

Collins testified in his defense in front of the jury. He admitted making the recorded confessions to the police, but denied making any oral unrecorded confessions, contrary to the officers' testimony. Collins admitted owning weapons very similar to the weapons used in the robberies. He also testified that he confessed to the robberies in order to save his cousin Lorenzo Perry from the certainty of jail because Perry was then on parole and they were very close relatives. Collins testified he did not fear a substantial jail sentence because he had never gotten into trouble before. He also testified that he confessed, because Det. Neske had assured him that all he wanted was to close the investigations and that he would charge Collins with the string of robberies in only one count, instead of as separate crimes. He also testified that he confessed to the criminal acts, using information about the robberies supplied by Det. Neske and Det. Fitzgerald. (Id. Ex. 6 at 515-603.)

## Petitioner's Grounds for Habeas Corpus

In his federal petition for habeas corpus relief, Collins alleges the following grounds:

1. In his closing argument the prosecutor improperly shifted the burden of proof to petitioner by commenting to the jury that petitioner failed to present an alibi defense.

2. Petitioner's trial counsel rendered constitutionally ineffective assistance when he failed to investigate and present the testimony of alibi witnesses Arkeycia Page, Rosemary Collins, and Aeesha Bell.

3. Petitioner's trial counsel rendered constitutionally ineffective assistance by failing to investigate and present evidence that petitioner suffered from a physical ailment that would have prevented him from committing the crimes.

Respondent has not argued that the merits of petitioner's grounds for relief are not properly before the court.

## Standard of Review

Habeas relief may be granted by a federal court on a claim previously adjudicated on its merits in a state court only when petitioner can show the state court decision:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). "A state court's decision is contrary to clearly established law if the controlling case law requires a different outcome either because of factual similarity to the state case or because general federal rules require a particular result in a particular case." Tokar v. Bowersox, 198 F.3d 1039, 1045 (8th Cir. 1999). The issue this court faces when deciding whether a state court unreasonably applied federal law is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000)(concurring opinion of O'Connor, J.). A federal habeas court may not issue a writ under the "unreasonable-application" clause "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411; see also Johnston v. Luebbers, 288 F.3d 1048, 1050 (8th Cir. 2002), cert. denied, 539 U.S. 1166 (2003).

<u>Ground 1</u>

During his initial closing arguments to the jury, the prosecutor argued the strengths of the state's case.  In his testimony from the stand, Collins admitted owning all the weapons the state offered into evidence that appeared similar to the ones the robber used.  In the January 10 robbery Collins let Stith into the restaurant through the usually locked back door.  All of the robberies were committed at approximately the same time.  Collins gave the police two tape recorded statements admitting some incriminating facts and contesting others.  The police had never dealt with Collins before and had no ulterior motive for lying.  The restaurants that were robbed are the ones that either Collins or Stith worked at; during some of the robberies Collins waited in the getaway car while Stith robbed the restaurant.  Collins's statements to the police were inconsistent with his trial testimony.

The prosecutor argued in closing that during the first robbery, of a Burger King on Dunn Road, Collins told Stith when the restaurant doors were to be closed, Collins received money in the robbery, and Collins did not call the police.  Collins and Stith had a longstanding relationship.  Collins admitted committing this robbery.

On the second robbery, charged in Count 3, the prosecutor argued the similar modus operandi and the fact that Collins knew that Stith had confessed his involvement.  Collins admitted to the police that he committed this robbery.

Regarding the third robbery, on April 17, 1997, charged in Count 5, the prosecutor argued that again Collins gave the police a statement that incriminated him.

Regarding the fourth robbery, on July 6, 1997, of the Burger King on Lindbergh Blvd., the prosecutor argued the use of the same modus operandi, the same clothing, height of robber, and weapon used.  Collins was then the ex-manager of that restaurant.

The prosecutor argued that Collins gave the police an incriminating statement in which he admitted being involved in the fifth robbery.

Stith went into the restaurant, with a firearm that Collins provided, and with Collins waiting outside.

In the Count 9 attempted robbery of the Steak 'N Shake on August 22, 1997, Collins entered the restaurant with the firearm and ordered employees to hand over the money. The prosecutor argued that Collins admitted this attempted robbery to the police.

In her summation and argument to the jury, defense counsel argued that, without Collins's incriminating statements to the police, the state's evidence was very weak. Much argument was made that Collins made the statements after being coached by the interrogator and to save his friend Stith and his cousin Perry. Perry was on probation and would likely receive a substantial sentence for the robberies and Collins thought he would likely get probation because of his good record. Counsel argued that the police lied to the jury when they denied making any promise of leniency to induce Collins's statements. Counsel argued the evidence was inconsistent about how tall the robber was in comparison with Collins's height.

In his reply argument, counsel for the state argued about Collins's guilt. Then he said,

> One thing that's interesting, they put on all this evidence and he came up with a song and dance and a story because he doesn't want to go to the penitentiary. And despite what they say, he's boxed in and he has to accuse detectives of lies. *They didn't give you an alibi for one of those . . . .*

(Doc. 15, Ex. 7 at 699-700)(emphasis added). At that point, defense counsel objected to the argument, "Objection. Shifting the burden." The judge sustained the objection. At the sidebar, counsel for Collins asked for a mistrial; the prosecutor argued that, when the defense puts on evidence denying guilt and does not offer any evidence of being somewhere else, the state is entitled to comment on that fact. (Id. at 700-01.) Ultimately the court denied the motion for a mistrial and then admonished the jury, "The defendant's objection is sustained. The jury will be instructed to disregard the last statement by the prosecutor." (Id. at 701.)

On appeal, the Missouri Court of Appeals ruled that the prosecutor's argument was not only "not clearly unwarranted" but also was a fair comment on the defendant's failure to produce evidence which would reasonably be expected, without referring to the defendant's own failure to testify in the indicated manner. (Id. Ex. 12 at 4.)

The rulings by the Missouri Circuit Court and the Missouri Court of Appeals in not granting Collins relief on account of the prosecutor's argument were reasonable and correct applications of the law. Collins testified in his own behalf. The state prosecutor was entitled to comment on the defendant's evidence and its weakness, including the lack of alibi evidence. Yancey v. Housewright, 664 F.2d 187, 190 (8th Cir. 1981). The factual context of Collins's ground for relief is similar to that in Burton v. Dormire, 295 F.3d 839 (8th Cir. 2002), cert. denied, 538 U.S. 1002 (2003). In Burton the Eighth Circuit stated,

> A state prosecutor may remind the jury that no alibi witnesses testified to the defendant's account of the events. Yancey v. Housewright, 664 F.2d 187, 190 (8th Cir. 1981) ("The prosecutor merely stated the obvious . . . he simply noted that in fact no such witnesses were in existence."). This appears to be precisely what happened in Burton's case. "[T]he prosecutor referred to defendant's failure to present evidence of his whereabouts on the night of the shooting. No particular or named witness who might have been called was mentioned." Burton, 710 S.W.2d at 309. "Even if [Burton] had not taken the witness stand, the comment by the prosecutor which merely drew the jury's attention to [Burton's] failure to present alibi witnesses would have been fair comment on the weakness of the defense and was not a violation of [his] right to remain silent." United States v. Higginbotham, 539 F.2d 17, 25 (9th Cir. 1976) (collecting cases); see Moore v. Wyrick, 760 F.2d 884, 886-87 & n. 2 (8th Cir. 1985) (per curiam). We therefore believe the Missouri Court of Appeals's resolution of this claim was not unreasonable. See 28 U.S.C. § 2254(d)(1).

Id. at 848. The rulings of the Missouri courts on this ground for relief were reasonable and correct as a matter of fact and as a matter of law. This ground for relief is without merit.

## Ground 2

Ground 2 alleges that petitioner's counsel was constitutionally ineffective for failing to offer alibi witnesses on four of the counts against him. The Missouri Court of Appeals ruled,

> Trial counsel testified that she chose not to call Mother and Sister because she was concerned about their credibility. Mother and Sister were sleeping during the time for which they were to provide Movant an alibi, and, therefore, could not say with certainty that he was at Mother's home, rather than the crime scene. Trial counsel expressed concern that they may appear biased because they were family members, and she was also concerned that their testimony that Movant did not have a key to the residence where he was staying might have suggested that his own family did not trust him.
>
> Trial counsel further explained that she did not call Girlfriend to testify because she did not think her testimony would appear credible. Girlfriend was sleeping during the time for which she was to provide Movant an alibi, and could not testify with certainty as to his whereabouts during the relevant times. Girlfriend maintained that Movant could not have left her house without her knowledge because he did not know the code to her security alarm and would have triggered it if he had left her home. Trial counsel expressed that she did not wish to present Girlfriend's testimony in part because she believed it odd that Girlfriend would allow Movant to stay at her home, but not trust him with the security code to her alarm. The motion court also pointed out that Movant's desire to have both Mother and Girlfriend presented as alibi witnesses would undermine the credibility of an alibi defense because their testimony would have offered differing accounts regarding where he resided in January 1997. Mother would have testified he lived in her home, but Girlfriend maintained that he resided with her.
>
> Trial counsel also indicated that calling Mother, Sister, and Girlfriend as alibi witnesses would have weakened her trial strategy of defending Movant by attacking the confessions which he alleged the police coerced him to make. This trial strategy was successfully used at his two previous trials on these charges, which resulted in mistrials due to a hung jury.
>
> . . . We agree with the motion court's finding that trial counsel exercised reasonable trial strategy in not calling Mother, Sister, and Girlfriend. We find no error in the motion court's denial of post-conviction relief because we

>     agree that Movant failed to show his trial counsel was
>     ineffective.

(Doc. 15 Ex. 17 at 4-5.)

In attacking the effectiveness of counsel on constitutional grounds, petitioner bears a heavy burden. "The purpose of the effective assistance guarantee of the Sixth Amendment . . . is simply to ensure that criminal defendants get a fair trial." Strickland v. Washington, 466 U.S. 668, 689 (1984). A federal habeas petitioner must show "actual ineffectiveness" by showing that counsel's errors caused actual prejudice to petitioner. Id. at 689, 693. If petitioner fails either part of the test, the other part need not be examined. Id. at 697. To be successful petitioner, must show both a deficient performance and actual prejudice as a result.

**Performance of petitioner's counsel**

Petitioner must show that counsel's performance was so far outside the range of professionally competent assistance that it overcomes the strong presumption that it might be considered sound legal strategy. Id. at 689.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation." Id. at 690-91.

**Prejudice**

Petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one sufficient to undermine confidence in the outcome. Id. at 697.

> In determining the existence vel non of prejudice, the court must consider the totality of the evidence before the judge or jury . . . .
>
> In this case, we are required to add the proffered testimony of [Petitioner 's] uncalled witnesses to the body of evidence that actually was presented at his trial. Using this hypothetical construct, we must gauge the likely outcome of a trial based on this total body of evidence. Prejudice exists if there is a reasonable probability that the outcome would be different than that at the actual trial. In conducting this analysis, we are mindful of: (1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.

McCauley-Bey v. Delo, 97 F.3d 1104, 1105-06 (8th Cir. 1996)(citations omitted).


## Factual Background of Ground 2

In his petition for post-conviction relief petitioner argued that his trial counsel was ineffective for failing to call alibi witnesses for some of the robberies. The robberies for which the witnesses could potentially offer alibis occurred in the early hours of the morning; the alibi witnesses were people who shared a household with the petitioner during the times in question[3]. Before January 1997, petitioner lived with his mother and sister; after that time, he lived with his girlfriend. The alibis petitioner asserted in his post-conviction motion are not date and time specific, but rather involve petitioner's ability to leave the residences. Testimony at the evidentiary hearing indicated that Collins lacked a key to his mother's house and the alarm code for his girlfriend's house. If found credible, this testimony would offer petitioner an alibi.

Petitioner's trial attorney testified at the post-conviction motion hearing that she was aware of the potential alibi witnesses and had

---

[3]Testimony at the evidentiary hearing indicates confusion as to where petitioner was living during January 1997.

talked to the petitioner's mother and girlfriend.  She testified that her
decision not to call the potential alibi witnesses was due to concerns
about how these witnesses could affect the petitioner's own credibility
before the jury.   Both witnesses indicated that they had limited
petitioner's access to their homes, even when he lived there.

**Analysis**

Using the <u>McCauley-Bey</u> analysis, the court first looks at the
credibility and impeachability of the uncalled witnesses.   Given the
early morning time of day involved, it is reasonable that petitioner
would only be able to offer people with close connections to him as
witnesses.   However, this creates an appearance of partiality and an
opportunity for impeachment.

The second <u>McCauley-Bey</u> factor is the interplay of called and
uncalled witnesses.   This factor asks how an uncalled witness would
support or undermine defense strategy as a whole.   Defense attorney
testified at the post-conviction motion hearing that the uncalled
witnesses did not fit her overall trial strategy.  "They were sleeping
at the time the robberies would have occurred . . . its not necessarily
compelling alibi testimony." (Doc. 15 Ex. 13 at 93.)  "[A]nother thing
was that Julius didn't have a key or the security -- the lock combination
to the houses and . . . I didn't like the implication that could be
raised, even if it wasn't that they didn't trust him with the key or the
security code." (<u>Id.</u> at 94).

At trial the defense centered on the credibility of the petitioner;
testimony that could indicate that those closest to him limited his
access to their homes could undermine that credibility.

The final <u>McCauley-Bey</u> factor is the strength of the evidence
against petitioner.  This is considered in conjunction with the first and
second factors.   The major evidence against defendant was a gun,
statements of two co-conspirators, and most convincingly, written and
audio taped confessions of petitioner himself.

The exclusion of the testimony of these asserted alibi witnesses did not prejudice petitioner. The alibi evidence claimed by petitioner could have either supported or undermined the petitioner's position at trial. Evidence that is of doubtful usefulness falls far short of the kind of evidence that undermines confidence in the outcome of a trial that is required by <u>Strickland</u>.

The rulings of the Missouri courts on Ground 2 were reasonable. Ground 2 is without merit.


### Ground 3

In Ground 3, petitioner alleges that his trial counsel failed to offer evidence at trial that he suffered from a physical condition that would have prevented him from committing the August 22, 1997 robbery, an injured ankle.

On this issue the Missouri Court of Appeals ruled:

> In Movant's third point he asserts that his trial counsel was ineffective for failing to present evidence that he had a pronounced limp during August 1997, which would have prevented him from participating in the acts charged in counts XI and XII. He contends that he had informed trial counsel that he had sprained his ankle on August 5, 1997. He maintains that he was told to stay off of his ankle for two to three weeks and was still using crutches or walking with a limp on August 22, 1997. He argues that evidence of his ankle injury should have been presented to the jury to explain that he could not have committed the attempted robbery on that date because there was no eyewitness testimony that the culprit walked with a limp.

> We agree with the motion court's finding that Movant failed to show that his trial counsel was ineffective for failing to present evidence of his ankle injury. Movant failed to show that there was a reasonable probability that, but for counsel's failure to present this evidence, the result of his proceeding would have been different. . . . We find no error in the motion court's finding that Movant's testimony regarding his ankle injury was not credible. The attempted robbery charged in counts XI and XII occurred two and a half weeks after Movant's sprain. Movant was advised to stay off of his injured ankle for two or three weeks. He was further advised to seek additional medical care if his condition did not improve in one to two weeks, but he never sought follow-up

treatment. Movant testified that he was able to walk on his ankle after a couple of weeks, but walked with a limp. There was no testimony presented, however, that he was incapable of committing the attempted robbery on August 22. Further, as noted by the motion court, the eyewitnesses' failure to mention to the police that the perpetrator had a limp does not mean that he did not limp, and no evidence was presented at Movant's post-conviction hearing showing that the perpetrator did not limp.

. . . Considering the questionable credibility of Movant's testimony regarding his ankle sprain, we can find no error in the motion court's determination that Movant failed to prove the injury would have provided him a viable defense or changed the outcome of his trial.

(Doc. 15, Exh. 17 at 5-6.)

## Factual Background

During the state's evidentiary hearing petitioner testified that he visited the emergency room on August 5, 1997 for an injured ankle (Ex. 13 at 68). The ankle was not broken, but petitioner indicated that he was still using crutches on August 22, 1997. He could walk without them, but with a limp. (Id. at 69). Petitioner's trial attorney did not attempt to document this injury, nor did she submit this evidence at trial.

Petitioner was convicted of attempting to rob the Steak 'N Shake restaurant around 3:15 on the morning of August 22, 1997. At trial, the witnesses to this incident described the man who attempted the robbery as "walking though the doors" (Ex. 4 at 336) and as "taking off" when the bell for the drive through sounded. (Id. at 334).

## Analysis

While McCauley-Bey factors were developed for use with alibi witness testimony, they are an appropriate framework for consideration of any exculpatory evidence unsubmitted by the defense.

Regarding the usefulness of the evidence to petitioner, the 12 day period between the hospital visit and the attempted robbery makes the relevance of the evidence questionable. Petitioner does not claim he

could not have committed the robbery, only that he still had a limp that went unmentioned by witnesses to the crime.

The second factor is the consistency of the evidence not presented with the defense's theory of the case. Evidence of a limp would have been consistent with petitioner's trial testimony that he did not commit the offense and might have indicated that his confession in this regard was false. However, there is a down side to this argument for the petitioner. Because of the 12-day period of time between his ankle sprain and his failure to receive follow-up care, the jury could have reasonably questioned the credibility of this evidence and thus his credibility.

When compared with the very strong evidence in the state's case, the ankle sprain evidence is not so compelling that failure to include it in the defense case created doubts as to the fairness of petitioner's trial. While there is no evidence that the gunman in the August 22 attempted robbery had a limp, there is no evidence that he lacked one either. In this case, with or without a 12-day old ankle sprain, it would still have been possible for petitioner to commit the crime. The lack of the ankle sprain evidence is not enough to undermine confidence in the result of the trial.

The decisions of the Missouri courts are reasonable and Ground 3 is without merit.

For these reasons, the petition of Julius Collins for a writ of habeas corpus is without merit. An appropriate order is issued herewith.

**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 10, 2006.